UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION



04 JAN 26 PM 1:40

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| JOHN MACK, | ] |
| | ] |
| Plaintiff, | ] |
| | ] |
| vs. | ] CV02-CO-02276-S |
| | ] |
| ALABAMA DEPARTMENT OF YOUTH SERVICES, | ] |
| | ] |
| | ] |
| Defendant. | ] |

**ENTERED**

JAN 2 6 2004

## MEMORANDUM OF OPINION

### I.   Introduction.

Presently before the court is a motion for summary judgment, filed by the defendant on October 23, 2003. [Doc. # 71.] The issues raised in the motion have been fully briefed by the parties, and are now ripe for decision. Upon due consideration, the court is of the opinion that the motion for summary judgment is due to be granted.

II.   Facts.[1]

A.   Plaintiff's Employment Duties.

Plaintiff John Mack ("Mr. Mack"), an African-American male, was employed as a Security Guard I by Defendant, Alabama Department of Youth Services ("DYS"), at its Chalkville facility from December 1987 until his termination on August 23, 2001.   As a security guard, Mr. Mack was responsible for monitoring and observing the overall movement of the detainees at the facility, including patrolling the facility's grounds, residences, buildings, and all surrounding areas.   Other material duties included transporting students, searching students, maintaining logs, records of attendance, capturing escapees, and the physical restraint of unmanageable detainees.   In the event of an escape, Mr. Mack was charged with searching the campus, woods, and surrounding areas.

---

[1]The facts set out below are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

It was DYS policy that its employees "use the minimum amount of force to restrain the students as dictated by that particular situation." [Mack Dep. Def.'s Ex. 9, p. 91.] To assist the security guards in adhering to this policy, guards were instructed to use handcuffs, plastic and leather restraints, a restraint board, and a helmet to bring an unmanageable detainee under control. [Def.'s Ex. 8.]

As part of DYS training, Mr. Mack was taught preventive intervention techniques to properly restrain detainees using the absolute minimum amount of force necessary. [Mack Dep. Def.'s Ex. 9, pp. 93-98.] Prior to using force, however, Mr. Mack was to first talk to the detainee to calm her down so that she would do as she was being instructed. [Mack Dep. Def.'s Ex. 9, pp. 100-01.] If that method did not work, Mr. Mack was to proceed by grabbing the detainee's hand or arm so that he could place handcuffs on her. [Mack Dep. Def's Ex. 9, p. 96.] If a security guard was unable to grab a detainee's arm or hand, he would try "to grab the student any kind of way to get [his] hands on them in order to get the hand" and "the best way [he could] without hurting them." [Mack Dep. Def.'s Ex. 9, pp. 96-97.]

**B.    DYS Disciplinary System & Plaintiff's Disciplinary Record.**

As an agency of the State of Alabama, DYS follows the personnel policies of the State of Alabama State Personnel Board which are contained in the Rules of the State Personnel Board.  The disciplinary system includes warnings, reprimands, suspensions, and terminations.    However, no published guidelines exist in the Rules of the State Personnel Board that explain what level of discipline is applicable to a specific infraction. [Spann Dep. Def.'s Ex. 7, pp. 30, 63-64.] In fact, an employee's conduct may be so egregious as to necessitate an immediate suspension or termination without first using a verbal or written warning or reprimand. [Spann Dep. Def.'s Ex. 7, p. 64.] DYS has a policy and procedure manual which Mr. Mack says was readily accessible to him and Mr. Mack signed a form acknowledging that he had read over the policies and procedures. [Mack Dep. Def.'s Ex. 9, p. 90.]

On April 5, 1989, Mr. Mack was disciplined after a detainee was AWOL for three hours before he realized it. [Mack Dep. Def.'s Ex. 9, p. 102.] A hearing was conducted but no further action was taken against Mr. Mack.

In 1993, Mr. Mack was accused of using excessive force to restrain a detainee named N.B.[2]  Mr. Mack received notice of the charges, the name of his accuser and the date of his disciplinary hearing. [Def.'s Ex. 17.]  After the hearing, it was determined that the allegations were unsupported but Mr. Mack was cautioned to exhaust his alternatives before resorting to force. [Def.'s Ex. 18.]

In 1994, Mr. Mack received a written warning regarding the presence of unauthorized visitors on campus.[3] [Def.'s Ex. 19.] However, no further action was taken against Mr. Mack regarding the matter.

In 1998, Mr. Mack received a written reprimand for failure to report off duty. [Def.'s Ex. 20.] On February 20, 2001, Mr. Mack was again

---

[2]Mr. Mack disputes that he was ever accused of using excessive force against N.B. However, he has not denied the existence of a letter from James Caldwell of DYS notifying him of N.B.'s allegations and setting a date and time for an administrative hearing. Nor does Mr. Mack deny a subsequent letter determining that the allegations were unsupported. [Pl.'s Ex. 17 & 18.] Instead, Mr. Mack points to his testimony and that of Debra Spann, a DYS personnel manager, in which she only acknowledges two disciplinary matters in Mr. Mack's personnel file, both involving failures to report off duty. However, Debra Spann further testified that student complaints are not kept in an employee's personnel file but rather handled by the advocacy staff and therefore, she would not have knowledge of them. [Spann Dep. Pl.'s Ex. 5, p. 26].

[3]Again, Mr. Mack points to the same testimony by Debra Spann regarding only two disciplinary matters in his personnel file and again Mr. Mack fails to account for the existence of a letter to the contrary in his Responsive Submission.

reprimanded for failure to report off duty. [Def.'s Ex. 22.] In May 2001, Clifford Toney warned Mr. Mack in a letter of his failure to follow procedures by not assisting a cottage staff member and a detainee to the hospital.[4] [Def.'s Ex. 22.]

### C.    Sexual Abuse Allegations against Plaintiff.

In the Spring of 2001, Mr. Mack, along with other Chalkville employees, were accused by then current and former detainees of improper sexual conduct. [Def.'s Ex. 7.] As a result of these accusations, DYS supervisors recommended to Mr. Walter Wood, DYS Executive Director, that Mr. Mack be terminated for inappropriate behavior and work performance. [Def.'s Ex. 14.] A disciplinary hearing was set for June 27, 2001. Due to the allegations, Mr. Mack was placed on paid administrative leave while an investigation was conducted. [Def.'s Ex. 7, pp. 30-33; Ex. 9, pp. 107, 117, 185.]

After the hearing, Mr. Wood concluded that the evidence was insufficient to warrant disciplinary action against Mr. Mack based on the sexual allegations. [Def.'s Ex. 24.] However, Mr. Wood did direct Mr. Mack

---

[4] *Supra,* note 3.

to receive further instruction regarding DYS and Chalkville procedures on the protection of juveniles. [Def.'s Ex. 24.]

### D.   Excessive Force Allegations against Plaintiff.

Around the same time of the sexual abuse allegations, Mr. Mack was accused of using excessive force against several detainees.  [Def.'s Ex. 26.]

#### 1.   The Escape Attempt.

Eight detainees were involved in an escape attempt that occurred on May 19, 2001. [Mack Dep. Def.'s Ex. 9, p. 121.]  Specifically, Mr. Mack is accused of the following during the course of the escape attempt: striking two of the girls on the head and face with his fist, elbow, or radio while one of the detainees was handcuffed; forcibly dragging another detainee on the ground by her shirt until her shirt ripped; forcibly dragging another detainee by her hair after he had already handcuffed her; and striking another detainee in the face. [Def.'s Ex. 10, pp. 46-48, 72, 78.]  Out of all the employees involved in the recapture of the detainees, Mr. Mack was the only employee accused by the detainees of striking them or using excessive force against them. [Def.'s Ex. 10, pp. 46-48.]

### 2.    The Alabama Cottage Incident.

After Mr. Mack returned the escapees to their dormitory, the Alabama

Cottage, he became involved in a physical altercation with C.B., one of the

detainees. [Mack Dep. Def.'s Ex. 9, pp. 133-34.] The exchange was

witnessed by Rita Leonard ("Ms. Leonard"), a DYS Youth Services Aide. Ms.

Leonard stated that Mr. Mack and C.B. "exchanged licks." [Def.'s Ex. 30.]

As a result of the incident, C.B. was temporarily moved to the Cherokee

Cottage. [Mack Dep. Def.'s Ex. 9, p. 137.]

### 3.    The Cherokee Cottage Incident.

After C.B. was taken to the Cherokee Cottage, a staff member

summoned Mr. Mack regarding C.B. being "out of control." [Mack Dep.

Def.'s Ex. 9, p. 138.] According to Mr. Mack, when he opened the time-out

room, where C.B. had been placed, she hit him in the face four or five

times, kicked him in the groin, broke his glasses, and began kicking him

repeatedly. [Mack Dep. Def.'s Ex. 9, p. 139.]

Mr. Mack stated that, during the scuffle, he became upset by C.B.'s

cursing and use of racial slurs. [Mack Dep. Def.'s Ex. 9, 139-40.] Although

Mr. Mack attempted to gain control of C.B. on his own, cottage staff

members Aurora Beals ("Ms. Beals") and Stephanie Rosenow ("Ms. Rosenow") had to assist Mr. Mack.

Mr. Mack testified that Ms. Beals held C.B.'s head to make sure that she did not injure herself. [Mack Dep. Def.'s Ex. 9, p. 142.] Ms. Beals stated that she "caught a glimpse of [Mr. Mack] hitting the student in the face," but the blows were "more like defensive, because the student kept hitting back." [Def.'s Ex. 10, pp. 230-32.] Ms. Rosenow stated that although she did not see Mr. Mack strike C.B., she believes he did based on what she heard. [Def.'s Ex. 10, p. 103.]

Mr. Mack admitted that he may have hit C.B. in "more like a defensive blow saying shut up or be quiet, its [sic] possible, ..." [Mack Dep. Def.'s Ex. 9, p. 143.] Mr. Mack acknowledged that when C.B. was lifted off of the floor, she had scratches on her neck and a split lip. [Mack Dep. Def.'s Ex. 9, p. 143.]

Pictures taken of C.B. after the incident show her with a black eye, a split lip, a substantial bruise under her chin, and a bruise on her arm. [Def.'s Ex. 34.] Mr. Mack maintains that C.B.'s injuries were "self inflicted" when she was in the time-out room. [Mack Dep. Def.'s Ex. 9, p. 147.]

Page 9 of 30

An internal investigation was conducted and Mr. Mack, who was already on administrative leave for the sexual misconduct allegations, was asked to remain on paid leave until a determination could be made with respect to these new allegations. [Mack Dep. Def.'s Ex. 9, pp. 117-19.]

    **4.    Mr. Mack's Administrative Hearing on the Accusations of Excessive Force.**

Another disciplinary hearing was held August 10, 2001, as a result of the allegations that Mr. Mack had used excessive force against the detainees. Based on the evidence presented at the hearing, the Hearing Officer reached the following conclusions:

> The evidence and testimony clearly reveal that the student did attempt to strike and eventually did strike Mr. Mack. However, his resorting to the use of his fists to strike the student is viewed as excessive. The nature of the injuries sustained by the student is indicative of excessive force being applied. This is particularly true when staff members were engaged in assisting to restrain the student.
>
> The consistency of the student statements and complaint forms, combined with the testimony during the hearing and the information obtained from the nurse who was called to the campus, leads this Hearing Officer to believe that the violations did occur in both instances. Mr. Mack's failure to satisfactorily dispute the claims made by the students and testimony of the

dorm staff during the hearing further leads the Hearing Officer
to believe that the allegations are substantiated.

[Def.'s Ex. 29, p. 3.]  The Hearing Officer recommended that Mr. Mack's

employment as a Youth Services Security Guard be terminated immediately.

[Def.'s Ex. 29, p. 3.] Mr. Wood terminated Mr. Mack's employment effective

August 23, 2001.  [Def.'s Ex. 6.]

### 5.    Mr. Mack's Subsequent Arrests.

As a result of one of the detainee's accusations regarding the escape

attempt,  Mr. Mack was arrested on October 12, 2001, pursuant to a charge

of  harassment,  filed  in  the  Jefferson  County  District  Court  -  Criminal

Disvision. [Def.'s Ex. 38.] A trial was set for November 27, 2001, but was

dismissed for want of prosecution when A.F. failed to appear for trial. [Def.'s

Ex. 38.]

As a result of Mr. Mack's altercation with C.B., the District Attorney's

Office  charged  Mr. Mack  with  felony  child  abuse.   He  was  indicted  on

January 11, 2002, and arrested on February 8, 2002. [Def.'s Ex. 39.] On

August 6, 2002, Mr. Mack pled guilty to a charge of assault in the third

degree. [Def.'s Ex. 40, p. 3.] Mr. Mack was given a twelve month suspended sentence and one year unsupervised probation. [Def.'s Ex. 40, pp. 4-5.]

### E.    Procedural History.

#### 1.    Mr. Mack's EEOC Charge.

On February 12, 2002, Mr. Mack filed an EEOC charge, alleging that he had been subjected to discrimination based on his race and sex.  On August 15, 2002, after a full investigation of Mr. Mack's claims, the EEOC dismissed his charge, in part because DYS submitted a legitimate non-discriminatory reason for his termination. [Def.'s Ex. 5] Mr. Mack's charge was formally dismissed and the EEOC issued a Notice of Right to Sue on August 30, 2002. [Compl., Doc. # 1.]

#### 2.    Mr. Mack's Lawsuit.

On September 13, 2002, Mr. Mack filed the present action against DYS and Mr. Wood, in his individual capacity, alleging race and gender discrimination under Title VII and 42 U.S.C. § 1983. [Compl., Doc. # 1.] On December 4, 2002, this court dismissed all § 1983 counts asserted against both DYS and Mr. Wood. [Doc. # 23 & # 24.]

The remaining claims against DYS include: (1) a claim for race discrimination in violation of Title VII of the Civil Rights Act of 1964 for failing to suspend white employees who were accused of sexual misconduct; (2) a claim for sex discrimination in violation of Title VII for failing to suspend female employees accused of sexual misconduct; (3) a claim for race discrimination in violation of Title VII for failing to terminate white employees accused of using excessive force; and (4) a claim for sex discrimination in violation of Title VII for failing to terminate female employees accused of using excessive force.

DYS filed the instant motion for summary judgment, along with support thereof, on October 23, 2003.  [Doc. # 71.]

## III.   Standard.

Summary judgment is proper "if the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and

identifying those portions of [the evidence] which it believes demonstrate

the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986). The movant can meet this burden by presenting

evidence showing that there is no genuine dispute of material fact, or by

showing that the nonmoving party has failed to present evidence in support

of some element of its case on which it bears the ultimate burden of proof.

*Celotex*, 447 U.S. at 322-23. In evaluating the arguments of the movant, the

court must view the evidence in the light most favorable to the nonmoving

party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once a moving party has met his burden, Rule 56(e) "requires the

nonmoving party to go beyond the pleadings and by her own affidavits, or by

the 'depositions, answers to interrogatories, and admissions on file,'

designate 'specific facts showing that there is a genuine issue for trial.'"

*Celotex*, 477 U.S. at 234 (quoting Fed. R. Civ. P. 56(e)). "A factual dispute

is genuine only if a 'reasonable jury could return a verdict for the nonmoving

party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224

(11th Cir. 2002) (quoting *United States v. Four Parcel of Real Property*, 941

F.2d 1428, 1437 (11th Cir. 1991)).

## IV.    Discussion.

### A.    Legal Framework of Title VII.

Mr. Mack alleges that he was intentionally discriminated against with respect to discipline.  Specifically, Mr. Mack claims that he was placed on administrative leave for sexual misconduct allegations and terminated for allegations of excessive force while white and female employees were accused of the same actions but received less severe or no disciplinary action at all.  Mr. Mack claims he was treated more harshly than white and female employees on the basis of his race and gender - an African-American male. "Whether an employer intentionally discriminated against an employee ... is a question of fact, which may be proved either through direct or circumstantial evidence." *EEOC v. Joe's Stone Crab*, 296 F.3d 1265, 1272 (11th Cir. 2002) (citation omitted).

Because Mr. Mack has not alleged direct evidence, he must prove his case through circumstantial evidence, using the familiar burden-shifting framework established in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* burden-shifting analysis, the plaintiff creates a rebuttable presumption of discrimination by proving a prima facie case of

discrimination, which consists of proof that:  (1) he was a member of a protected class; (2) and was subjected to an adverse employment action;  (3) while  similarly situated individuals outside the protected class were treated more favorably; and (4) he was qualified for his job.  *Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997).

If the plaintiff succeeds in presenting a prima facie case of discrimination, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the challenged employment action.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 113, 142 (2000).  "This burden is one of production, not persuasion; it can involve no credibility assessment." *Id*.  Once the presumption is rebutted, the employer is entitled to summary judgment unless the plaintiff proffers evidence from which a reasonable factfinder could conclude that the reason articulated by the defendant was mere pretext for discrimination.  *Kelliher v. Veneman*, 313 F.3d 1270, 1275 (11th Cir. 2002).

A.   **Prima Facie Case of Discrimination.**

1.   **Mr. Mack's Paid Administrative Leave due to Sexual Misconduct Allegations.**

Mr. Mack was placed on paid administrative leave during the investigation of the sexual misconduct allegations. Mr. Mack claims that this constitutes race and gender discrimination because white and female workers were accused of sexual misconduct but were not placed on paid administrative leave. As to these claims, the court is satisfied that Mr. Mack has established three of the elements of his prima facie case. He is a member of a protected class (African-American male), similarly situated white and female employees were not placed on administrative leave, and at the time, Mr. Mack was rated qualified for the job in question by supervisors. However, the court concludes that all of Mr. Mack's Title VII claims relating to his suspension for sexual abuse allegations must fail due to his inability to establish an essential element of his prima facie case — that he suffered an adverse employment action.

An adverse employment action, for purposes of Title VII liability, involves "a *serious and material* change in the terms, conditions, or

privileges of employment." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in original). Indeed, "the asserted impact ... must at least have a tangible adverse effect on the plaintiff's employment" for the alleged adverse act to give rise to a cognizable claim. *Id.*

It is undisputed that Mr. Mack was placed on administrative leave with pay. Thus, although he was suspended when white and female employees continued working, this did not ultimately result in a tangible harm or change in the terms, conditions or privileges of employment, since he was compensated as if he had worked during that time. Also, after a hearing on the allegations of sexual misconduct, the hearing officer determined that Mr. Mack should not be terminated because the allegations were unsubstantiated. Because he did not suffer any change in his employment status, much less any serious and material change, he did not suffer an adverse employment action.

As a result, Mr. Mack cannot make out a prima facie case of race and gender discrimination based on his suspension with pay for allegations of sexual misconduct. *See Gupta v. Florida Bd. of* Regents, 212 F.3d 571, 587

(11th Cir. 2000). *See Crittenden v. Int'l Paper Co. Wood Prods. Div.*, 214 F.

Supp. 2d 1250, 1254 (M.D. Ala. 2002) ("[W]hile the failure to immediately

reinstate [the plaintiff] to the position he held prior to his termination,

standing alone, may have been an adverse employment action, the relief

[the plaintiff] received as a result of the grievance process, including full

reinstatement and back pay, removes the initial decision not to reinstate him

to his former position from the scope of the protection of [Title VII].").

Therefore, summary judgment is due to be granted as to these claims.

### 2.   Mr. Mack's Termination for Use of Excessive Force.

The court will now turn to Mr. Mack's claims of race and gender

discrimination based on allegations of excessive force.   Mr. Mack has

established that he is a member of a protected class — an African-American

male — and that he was subjected to an adverse job action when he was

terminated.   DYS argues that Mr. Mack cannot prove the fourth prong of the

*McDonnell Douglas* prima facie requirement, which is that Mr. Mack was

qualified for his job.   Specifically, DYS claims that since Mr. Mack was

discharged for unsatisfactory performance of his duties by using excessive

force in violation of DYS policy, he was not qualified to perform his job as a

security guard.  Eleventh Circuit precedent, however, holds that "if a plaintiff has enjoyed a long tenure at a certain position, we can infer that he or she is qualified to hold that particular position." *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1360 (11th Cir. 1999) ( citing *Pace v. Southern Railway System*, 701 F.2d 1383, 1386 n.7 (11th Cir. 1983)) (finding that "where a plaintiff has held a position for a significant period of time, qualification for that position, sufficient to satisfy a prima facie case, can be inferred").  The Eleventh Circuit goes further stating, " In finding the Appellants unqualified, the district court incorrectly considered [the defendant's] allegations of Appellants' poor performance.  Our caselaw quite clearly instruct that plaintiffs, who have been discharged from a previously held position, do not need to satisfy the *McDonnell Douglas* prong "'requiring proof of qualification.'" (citations omitted).  *Damon* at 1360.

DYS's allegations of poor performance are not to be completely ignored, however.  The Eleventh Circuit goes on to find that the defendant's allegations should be considered by the court "when a court evaluates the pretextual nature of an employer's proffered nondiscriminatory reasons for termination." *Id.*

In the case at hand, Mr. Mack was employed by DYS for nearly fourteen years. He regularly met or exceeded standards on his Employee Performance Appraisals and received merit raises as a result. Therefore, the court will infer, at this prima facie stage, that Mr. Mack was qualified to perform his job. The court will reserve consideration of DYS's argument of unsatisfactory performance until the burden is on it to offer a nondiscriminatory reason for its employment decision.

The only question remaining as to Mr. Mack's prima facie case is whether he has established that a similarly situated employee outside the protected class was disciplined less harshly for similar behavior. In proving his Title VII claims for race and gender discrimination in his termination, Mr. Mack contends that Johnny Bartlett, Philip Henry, Aurora Beals, and Ruby Sharp are appropriate comparators who were accused of using excessive force but treated more favorably than he but not terminated.

"In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Med. Ctr.*, 137

F.3d 1306, 1311 (11th Cir. 1998).  The most important factors to consider in

determining whether an employee is a proper comparator are the nature of

the offenses committed and the nature of the punishments imposed.  *Jones*,

137 F.3d at 1311.  Indeed, "the comparator's misconduct must be nearly

identical to the plaintiff's in order to prevent courts from second-guessing

employers' reasonable decisions and confusing apples with oranges." *Silvera*

*v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (Putative comparator not

similarly situated with Plaintiff where putative comparator has a record of

one previous arrest, while Plaintiff has four previous arrests, three of which

were for violent assaults);  *Maniccia v. Brown*, 171 F.3d 1364, 1369 (11th Cir.

1999) (Plaintiff not similarly situated to employees who each committed a

single policy violation where Plaintiff had committed at least four policy

violations); *Jones*, 137 F.3d at 1312-13 (employees who allegedly committed

single act of misconduct in one day not similarly situated to Plaintiff who had

engaged in multiple instances of misconduct on the same day).  However,

while the quantity and quality of the conduct engaged in by the plaintiff and

the putative comparator must be similar, the putative comparator need not

have the same job title as the plaintiff.  *Lathem v. Dep't of Children &*

*Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999) (Plaintiff's direct supervisor could serve as a proper comparator).  The court will restrict its discussion to the comparators specifically set forth in Plaintiff's Responsive Submission and evaluate each in turn.

First, Mr. Mack testified that Johnny Bartlett, a white security guard, was accused of striking a student with his fist in August of 1990, but was not terminated.  Indeed, Mr. Barlett was only given a one week suspension from work. [Def.'s Ex. 50.] However, at the time of Mr. Bartlett's suspension and as of October 2003, when Debra Spann, DYS Personnel Manager, signed a notarized affidavit, Mr. Barlett had no other disciplinary actions against him prior to or after this particular incident. [Spann Aff. Def.'s Ex. 41.] Further, in a letter sent to Mr. Bartlett regarding his one week suspension, the DYS Director noted that Mr. Barlett had no previous disciplinary record in his file and that the Director considered Mr. Barlett's "excellent employment record in limiting" the disciplinary action "to the minimum appropriate for the violation" but would consider dismissal if further such violations occurred. [Def.'s Ex. 50.]

Second, Mr. Mack points to Philip Henry, a white male DYS employee, as a putative comparator. Mr. Mack alleges in his deposition that Mr. Henry told him that he struck a student so hard that he broke his hand. [Mack Dep. Pl.'s Ex. 3, p. 188-91.] Mr. Mack believes the incident occurred in 1998. In her affidavit, Personnel Manager, Debra Spann, noted that in January 1992, Mr. Henry was suspended for three days without pay for hitting a male detainee. [Spann Aff. Def.'s Ex. 41.] Mr. Mack claims that Mr. Henry was not even given a disciplinary hearing, but DYS Exhibit # 53, offers a letter from James Caldwell, Superintendent, to Mr. Henry which states that a hearing was held on January 24, 1992. In the letter, Mr. Caldwell warned Mr. Henry that similar conduct in the future would necessitate stronger disciplinary action. Debra Spann states in her affidavit that this was the only incident in Mr. Henry's file and that by October 1996, Mr. Henry was no longer employed with DYS. [Spann Aff. Def.'s Ex. 41.]

Third, Mr. Mack contends that Ms. Aurora Beals, an Asian female DYS employee, was accused of beating C.B.'s head on the floor during the incident in question; yet, Ms. Beals was not placed on leave or terminated for using excessive force. However, none of the eleven detainees and no

Page 24 of 30

Chalkville employee accused or alleged that Ms. Beals injured C.B. [Def.'s Ex. 10.] Mr. Mack even testified that Ms. Beals came "to the front to try to control [C.B.'s] head." [Pl.'s Ex. 3, p. 142.] When asked whether Ms. Beals was trying to protect C.B.'s head, Mr. Mack responded, "Yes." [Id. at 145.] Further, Debra Spann stated in her sworn affidavit that Ms. Beals' personnel file was "without blemish." [Spann Aff. Def.'s Ex. 41.]

Finally, Mr. Mack alleges that Ruby Sharp, an African-American female DYS employee, was accused of striking a student with a closed fist, but was not terminated or disciplined. He testified that he knew about this incident from "word of mouth." [Pl.'s Ex. 3, p. 179.] Debra Spann stated that Ms. Sharp has been suspended twice for three days, without pay, for leaving her post without authorization and for using profanity towards a detainee. [Spann Aff. Def.'s Ex. 41.] Specifically, Ms. Sharp was accused of provoking a student by pointing her finger in her face and cursing her.  Also, another staff member stated that Ms. Sharp was so out of control that she had to intervene and hold the door to keep Ms. Sharp out of the building due to her cursing and threatening the student. [Def.'s Ex. 54].  Debra Spann stated

that there was nothing in Ms. Sharp's personnel file that she ever used or was accused of using excessive force against a detainee. [Def.'s Ex. 41.]

The court is of the opinion that none of these DYS employees are proper comparators. None of them were accused of injuring a student to the extent of bruising, cuts, black eyes, split lips, and loose teeth, as was alleged against Mr. Mack. Nor had any of these employees received the same number of previous disciplinary actions against them as Mr. Mack had received before being terminated.

On April 5, 1989, Mr. Mack was disciplined after a detainee was AWOL for three hours before he realized it. [Mack Dep. Def.'s Ex. 9, p. 102.] In 1993, Mr. Mack was accused of using excessive force to restrain a detainee named N.B. After the hearing, it was determined that the allegations were unsupported but Mr. Mack was cautioned to exhaust his alternatives before resorting to force. [Def.'s Ex. 18.] In 1994, Mr. Mack received a written warning regarding the presence of unauthorized visitors on campus. [Def.'s Ex. 19.] In 1998, Mr. Mack received a written reprimand for failure to report off duty. [Def.'s Ex. 20.] On February 20, 2001, Mr. Mack was again reprimanded for failure to report off duty. [Def.'s Ex. 22.] In May 2001,

Clifford Toney warned Mr. Mack in a letter of his failure to follow procedures by not assisting a cottage staff member and a detainee to the hospital. [Def.'s Ex. 22.]   As stated earlier in this opinion, Mr. Mack never disputed the existence of the evidence presented by DYS, but only pointed to Debra Spann's deposition in which she only saw two instances of disciplinary action in Mr. Mack's personnel folder.  Ms. Spann also stated in the deposition that she did not have access to any student complaints as they were handled by the advocacy staff.

The court is of the opinion that these employees are not proper comparators.   The named employees' misconduct was not of a similar *quantity* or *quality* as Mr. Mack's conduct.   As such, Mr. Mack cannot establish a prima facie case of race or gender discrimination in his termination for use of excessive force.  Therefore, summary judgment is due to be granted as to these claims.

C.     **Non-Discriminatory Reason for the Adverse Employment Action and Proof of Pretext.**

However, even if Mr. Mack had established a prima facie case of gender and race discrimination, DYS has articulated a legitimate, non-discriminatory

reason for terminating Mr. Mack, and he cannot establish that this reason is mere pretext for race and gender discrimination. DYS alleges that it terminated Mr. Mack for violation of DYS policy in using excessive force against a detainee and as a result, he was not qualified to perform his job. Assuming he could establish a prima facie case of race and gender discrimination, Mr. Mack would have to amass evidence sufficient to permit a reasonable factfinder to conclude that this articulated reason is mere pretext for discrimination.

An employee cannot establish pretext "by simply quarreling with the wisdom of the [employer's] reason." *Chapman v. Al Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000). Rather, the employee must establish that the employer's proffered reason is "worthy of credence, or that the defendant [was] more likely motivated by a discriminatory reason." *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997). To be unworthy of credence, the employer's proffered reason must be rife with "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions." *Standard v. A.B.E.L. Servc., Inc.*, 161 F.3d 1318, 1333 (11th Cir. 1998). Ultimately, "[t]he pretext inquiry is concerned with the employer's perception of the employee's

performance, not the employee's own beliefs." *Id.* at 1332-33.  So long as

the employer has a good faith belief that the employee engaged in conduct

warranting termination, the employer is entitled to summary judgment.

*EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000).

Mr. Mack argues that he has established pretext because DYS's

allegation that he engaged in improper conduct is false.  He also claims that

DYS's reasons for terminating him were inconsistent and that DYS's reliance

on his alleged misconduct and past work performance are therefore pretext

for discrimination.  Specifically, Mr. Mack argues that DYS stated twice that

the reason for Mr. Mack's termination was excessive force, but it was not

until the summary judgment phase that DYS mentioned any criminal conduct,

violation of job duties, or past performance history.  However, the court is

of the opinion that Mr. Mack has not established that DYS did not believe that

Mr. Mack was unfit to perform his job.  Whether or not the underlying

allegations against Mr. Mack are true, DYS held a good faith belief that

evidence presented at his hearing and past disciplinary actions warranted Mr.

Mack's termination.   As such, Mr. Mack cannot establish that DYS's

articulated reasons for terminating him is mere pretext for race and gender

Page 29 of  30

discrimination.  Therefore, even if Mr. Mack had established a prima facie case of discrimination, summary judgment in favor of the defendant would still be warranted.

**V.    Conclusion.**

DYS's motion for summary judgment is due to be granted on all counts. The court will enter an appropriate order in conformity with this memorandum of opinion.


Done, this _____26_____ of  January, 2004.


L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE


Page 30 of  30